**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **WILLIAM BRAINARD;** | ) | |
| | ) | |
| **LARRY H. COOKE;** | ) | |
| | ) | |
| **SAMANTHA DENT;** | ) | |
| | ) | |
| **ELMO GAY;** | ) | **CIVIL ACTION NO.** |
| | ) | |
| **DONNA GOGGINS;** | ) | **4:10-cv-00255** |
| | ) | |
| **JAMES LEVERT GRAY;** | ) | |
| | ) | |
| **TARA JOHNSON,** Individually and as | ) | |
| the Administratrix of the Estate of | ) | |
| **WILLIAM JAMES JOHNSON,** | ) | |
| Deceased**;** | ) | **JURY DEMAND** |
| | ) | |
| **TIMOTHY JONES;** | ) | |
| | ) | |
| **MARCUS LAWSON;** | ) | |
| | ) | |
| **LARRY LADON LOVE;** | ) | |
| | ) | |
| **JAMES ALVIN MAYNARD;** | ) | |
| | ) | |
| **RICHARD PERDUE;** | ) | |
| | ) | |
| **JIMMIE L. PETERSON;** | ) | |
| | ) | |
| **CARRIE JEAN PIERCE;** | ) | |
| | ) | |
| **ALICE FAY RICHARDS;** | ) | |
| | ) | |
| **DEDE MOORE,** Individually and as | ) | |
| the Administratrix of the Estate of | ) | |
| **DIANA SIMONS,** Deceased**;** | ) | |
| | ) | |
| **JACQUELINE V. STRICKLIN;** | ) | |
| | ) | |
| **SUSIE TAYLOR; and** | ) | |
| | ) | |
| **GREGORY WARE;** | ) | |
| | ) | |

|  |  |
|---|---|
| **PLAINTIFFS,** | ) |
|  | ) |
| **VS.** | ) |
|  | ) |
| **ASBESTOS DEFENDANTS:** | ) |
|  | ) |
| ALLIS-CHALMERS CORPORATION PRODUCT LIABILITY TRUST; | ) ) ) ) |
|  | ) |
| **AMERICAN OPTICAL CORPORATION;** | ) ) ) |
|  | ) |
| **CERTAINTEED CORPORATION;** | ) ) |
|  | ) |
| **CRANE CO.;** | ) ) |
|  | ) |
| **FEDERAL-MOGUL ASBESTOS PERSONAL INJURY TRUST** as successor to **FELT PRODUCTS MANUFACTURING CO.** and/or the former **VELLUMOID DIVISION** of **FEDERAL-MOGUL CORPORATION;** | ) ) ) ) ) ) ) ) |
|  | ) |
| **FORD MOTOR COMPANY;** | ) ) |
|  | ) |
| **J-M MANUFACTURING COMPANY, INC.;** | ) ) ) |
|  | ) |
| **GOODRICH CORPORATION f/k/a THE B. F. GOODRICH COMPANY;** | ) ) ) |
|  | ) |
| **METROPOLITAN LIFE INSURANCE COMPANY;** | ) ) ) |
|  | ) |
| **PFIZER, INC.;** | ) ) |
|  | ) |
| **USX CORPORATION** as successor in interest to UNITED STATES STEEL, LLC, formerly known as **TENNESSEE COAL AND IRON; and** | ) ) ) ) ) |
|  | ) |
| **YARWAY CORPORATION;** | ) ) ) ) |

**DEFENDANTS.**   )
                  )

## PLAINTIFFS' ORIGINAL COMPLAINT AND JURY DEMAND

COMES NOW, Brainard, William; Cooke, Larry H.; Dent, Samantha; Gay, Elmo; Goggins, Donna; Gray, James Levert; Tara Johnson, Individually and as the Administratrix of the Estate of William James Johnson, Deceased; Jones, Timothy; Lawson, Marcus; Love, Larry Ladon; Maynard, James Alvin; Perdue, Richard; Peterson, Jimmie L.; Pierce, Carrie Jean; Richard, Alice Fay; De De Moore, Individually and as the Administratrix of the Estate of Diana Simons, Deceased; Stricklin, Jacqueline V.; Taylor, Susie; and Ware, Gregory, hereinafter collectively referred to as "Plaintiffs", complain of the various Defendants listed below and for causes of action would show the Court and Jury as follows:

### JURISDICTION

This Court has subject jurisdiction over this case pursuant to 28 U.S.C. § 1332. Plaintiffs and Defendants are citizens of different states. The amount in controversy, exclusive of interest and costs, exceeds $75,000.00 for each Plaintiff and is within the jurisdiction of the Court.

### STATUTE OF LIMITATIONS

"Federal courts sitting in diversity cases must apply the substantive laws of the states in which they sit, and statutes of limitations are considered substantive" *Van Buskirk v Cary Canadian Mines, Ltd.*760 F.2d 481(3rd Cir. Pa., 1985).  Therefore, the Texas Statute of limitations, and other related statutes, apply to this case.

### BACKGROUND FACTS — THE PLAINTIFFS

1.     Plaintiff **WILLIAM BRAINARD**, a resident of Decatur, Alabama, contracted one or more asbestos-related diseases including Asbestosis. Plaintiff was continually exposed to asbestos-containing products, produced, manufactured, specified for use, installed, distributed, sold and/or placed into the stream of commerce by defendants as specified herein throughout his employment, and in his environment while employed.

During the course of his employment, Plaintiff William Brainard worked, including but not limited to, as a serviceman in the United States Army approximately 1968 to 1970 in various locations; as an insulator for Finley Insulation Company from approximately 1971 to 1973 in Spartanburg, South Carolina; and as a inspector and supervisor for Cook's Pest Control Company from approximately 1975 to 1981 in Decatur, Alabama; around equipment in his workplace, including but not limited to insulation, joint compound, boilers, furnaces, pipes, rope, cement, and paint, which contained significant amounts of asbestos-containing products and materials.

Plaintiff William Brainard was diagnosed with asbestos-related Asbestosis on or about December 18, 2009.

2.     Plaintiff **LARRY H. COOKE**, a resident of Cedar Bluff, Alabama, contracted one or more asbestos-related diseases including Asbestosis. Plaintiff was continually exposed to asbestos-containing products, produced, manufactured, specified for use, installed, distributed, sold and/or placed into the stream of commerce by defendants as specified herein throughout his employment, and in his environment while employed.

During the course of his employment, Plaintiff Larry H. Cooke worked, including but not limited to, as a construction worker for Wilkins and Cason during approximately 1973 in San Diego, California; as a construction worker for The Austin Company during

approximately 1973 in San Diego, California; as a construction worker for Universal Electric during approximately 1973 in San Diego, California; as a construction worker for Cal-Russ Construction Corp. during approximately 1977 in San Diego, California; as a construction worker for Atlas Fence Company during approximately 1987 in San Diego, California; as a heavy equipment operator for Gold Kist Co. from approximately 1996 to 2000 in Boaz, Alabama; as a heavy equipment operator for Good Hope Construction Co. from approximately 2001 to 2002 in Cullman, Alabama; and as a heavy equipment operator for Greer Construction Co. during approximately 2002 in Gadsden, Alabama; around equipment in his workplace, including but not limited to insulation, joint compound, brakes, felt, frictions, boilers, pipes, rope, bricks, cement, and paint, which contained significant amounts of asbestos-containing products and materials.

Plaintiff Larry H. Cooke was diagnosed with asbestos-related Asbestosis on or about December 24, 2009.

3.       Plaintiff **SAMANTHA DENT**, a resident of Piedmont, Alabama, contracted one or more asbestos-related diseases including Asbestosis.  Plaintiff was secondarily exposed to asbestos-containing products, produced, manufactured, specified for use, installed, distributed, sold and/or placed into the stream of commerce by defendants as specified herein throughout her father's employment, and in her father's environment while employed.

During Plaintiff's childhood, while living with her father, Samuel Heard, Sr., she laundered his clothing that was worn during the course of his employment. During the course of Samuel Heard Sr.'s employment he worked, including but not limited to, as a laborer and molder for Woodward Iron from approximately 1960 to 1974 in Anniston,

Alabama; around equipment in his workplace, including but not limited to furnaces, bricks, insulation, packing, and cement, which contained significant amounts of asbestos-containing products and materials.

Plaintiff Samantha Dent was diagnosed with asbestos-related Asbestosis on or about November 24, 2009.

4.      Plaintiff **ELMO GAY**, a resident of Decatur, Alabama, contracted one or more asbestos-related diseases including Pleural Disease.  Plaintiff was continually exposed to asbestos-containing products, produced, manufactured, specified for use, installed, distributed, sold and/or placed into the stream of commerce by defendants as specified herein throughout his employment, and in his environment while employed.

During the course of his employment, Plaintiff Elmo Gay worked, including but not limited to, as a serviceman in the United States Navy from approximately 1958 to 1966 in various locations; as a laborer for Southern Safety Supply from approximately 1970 to 1973 in Tampa, Florida; as a pipe fitter and welder for Harris Bussell Piping Service from approximately 1973 to 1975 in Tampa, Florida; as a pipe threader for Florida Fire Sprinklers from approximately 1975 to 1980 in Tampa, Florida; and as a construction worker in business for himself from approximately 1980 to 1988 in Tampa, Florida; around equipment in his workplace, including but not limited to insulation, joint compound, boilers, pipes, rope, packing, and paint, which contained significant amounts of asbestos-containing products and materials.

Plaintiff Elmo Gay was diagnosed with asbestos-related Pleural Disease on or about December 9, 2009.

5.      Plaintiff **DONNA GOGGINS**, a resident of Tallassee, Alabama, contracted one or more asbestos-related diseases including Asbestosis.  Plaintiff was continually exposed to asbestos-containing products, produced, manufactured, specified for use, installed, distributed, sold and/or placed into the stream of commerce by defendants as specified herein throughout her employment, and in her environment while employed.

During the course of her employment, Plaintiff Donna Goggins worked, including but not limited to, as a sewer for Russell Mills from approximately 1980 to 1981 in Alexander City, Alabama; around equipment in her workplace, including but not limited to yarn, insulation, frictions, rope, gaskets, and packing, which contained significant amounts of asbestos-containing products and materials.

During Plaintiff's childhood, while living with her parents, Lottie Mathis Melton and Donald Paul Melton, she laundered her parents' clothing that was worn during the course of their employment. During the course of Lottie Mathis Melton's employment she worked, including but not limited to, as a battery loader for Avondale Mills from approximately 1971 to 1975 in Alexander City, Alabama; around equipment in her workplace, including but not limited to yarn, insulation, frictions, tape, rope, gaskets, packing, and cloth, which contained significant amounts of asbestos-containing products and materials.  During the course of Donald Paul Melton's employment he worked, including but not limited to, as a machine operator for Avondale Mills from approximately 1971 to 1974 in Alexander City, Alabama; around equipment in his workplace, including but not limited to yarn, insulation, frictions, tape, rope, gaskets, packing, and cloth, which contained significant amounts of asbestos-containing products and materials.

Plaintiff Donna Goggins was diagnosed with asbestos-related Asbestosis on or about November 2, 2009.

6.     Plaintiff **JAMES LEVERT GRAY**, a resident of Eutaw, Alabama, contracted one or more asbestos-related diseases including Asbestosis.  Plaintiff was continually exposed to asbestos-containing products, produced, manufactured, specified for use, installed, distributed, sold and/or placed into the stream of commerce by defendants as specified herein throughout his employment, and in his environment while employed.

During the course of his employment, Plaintiff James Levert Gray worked, including but not limited to, as a serviceman in the United States Army from approximately 1978 to 1985 in various locations; around equipment in his workplace, including but not limited to insulation, joint compound, pipes, paint, boilers, and bricks, which contained significant amounts of asbestos-containing products and materials.

Plaintiff James Levert Gray was diagnosed with asbestos-related Asbestosis on or about November 25, 2009.

7.     Plaintiff **TARA JOHNSON**'s Decedent, **WILLIAM JAMES JOHNSON,** a resident of Mobile, Alabama, prior to his death contracted one or more asbestos-related diseases including Lung Cancer.  Decedent was continually exposed to asbestos-containing products, produced, manufactured, specified for use, installed, distributed, sold and/or placed into the stream of commerce by defendants as specified herein throughout his employment, and in his environment while employed.

During the course of his employment, Decedent William James Johnson worked, including but not limited to, as a laborer for McInnis Corporation from approximately 1981 to 1989 in Montgomery, Alabama; and laborer for May Bank Shipyard from approximately

1989 to 1995 in Mississippi; around insulation, pipes, joint compound, pumps, valves and other industrial equipment in his workplace, which contained significant amounts of asbestos-containing products and materials.

Plaintiff's Decedent died of asbestos-related Lung Cancer as the result of exposure to asbestos and asbestos-containing materials and products, on or about, February 2, 2008. This case is brought by Decedent, William James Johnson's spouse and personal representative Tara Johnson.

8.     Plaintiff **TIMOTHY JONES**, a resident of Birmingham, Alabama, contracted one or more asbestos-related diseases including Asbestosis.  Plaintiff was continually exposed to asbestos-containing products, produced, manufactured, specified for use, installed, distributed, sold and/or placed into the stream of commerce by defendants as specified herein throughout his employment, and in his environment while employed.

During the course of his employment, Plaintiff Timothy Jones worked, including but not limited to, as a serviceman in the United States Army from approximately 1968 to 1970 in various locations; and as a coal miner for Mulga Coal Mines (a/k/a Woodward Iron) from approximately 1970 to 1983 in Mulga, Alabama; around equipment in his workplace, including but not limited to furnaces, pipes, insulation, joint compound, gaskets, firebrick, which contained significant amounts of asbestos-containing products and materials.

Plaintiff Timothy Jones was diagnosed with asbestos-related Asbestosis on or about December 18, 2009.

9.     Plaintiff **MARCUS LAWSON**, a resident of Birmingham, Alabama, contracted one or more asbestos-related diseases including Asbestosis.  Plaintiff was

continually exposed to asbestos-containing products, produced, manufactured, specified for use, installed, distributed, sold and/or placed into the stream of commerce by defendants as specified herein throughout his employment, and in his environment while employed.

During the course of his employment, Plaintiff Marcus Lawson worked, including but not limited to, as a holder for Pullman Standard Car Manufacturing Co. from approximately 1975 to 1977 in Bessemer, Alabama; as a general laborer for Bill Brown Construction Company from approximately 1977 to 1979 in Birmingham, Alabama; and as a molder and general laborer for the Southern Ductile Casting Co. from approximately 1979 to 1985 in Bessemer, Alabama; around equipment in his workplace, including but not limited to insulation, joint compound, pipes, boilers, furnaces, brakes, frictions, valves, pumps, cement, and bricks, which contained significant amounts of asbestos-containing products and materials.

Plaintiff Marcus Lawson was diagnosed with asbestos-related Asbestosis on or about December 16, 2009.

10.     Plaintiff **LARRY LADON LOVE**, a resident of Anniston, Alabama, contracted one or more asbestos-related diseases including Asbestosis.  Plaintiff was continually exposed to asbestos-containing products, produced, manufactured, specified for use, installed, distributed, sold and/or placed into the stream of commerce by defendants as specified herein throughout his employment, and in his environment while employed.

During the course of his employment, Plaintiff Larry Ladon Love worked, including but not limited to, as a boiler technician's assistant for Bennett Lumber Co. from approximately 1960 to 1961 in Piedmont, Alabama; as a mechanic for Tony Love Service Station from approximately 1962 to 1965 in various locations; as a combat vehicle

mechanic for the Anniston Army Depot from approximately 1965 to 1968 in Anniston, Alabama; and as a steam pipes area supervisor for Goodyear Tire Co. from approximately 1969 to 1988 in Gadsden, Alabama; around equipment in his workplace, including but not limited to insulation, joint compound, pipes, boilers, gaskets, brakes, valves, pumps, and bricks, which contained significant amounts of asbestos-containing products and materials.

Plaintiff Larry Ladon Love was diagnosed with asbestos-related Asbestosis on or about October 22, 2009.

11.    Plaintiff **JAMES ALVIN MAYNARD**, a resident of Wetumpka, Alabama, contracted one or more asbestos-related diseases including Pleural Disease.  Plaintiff was continually exposed to asbestos-containing products, produced, manufactured, specified for use, installed, distributed, sold and/or placed into the stream of commerce by defendants as specified herein throughout his employment, and in his environment while employed.

During the course of his employment, Plaintiff James Alvin Maynard worked, including but not limited to, as an engineman in the United States Navy from approximately 1960 to 1964, and from 1970 to 1973 in various locations; and as a carpenter for Maxwell Air Force Base from approximately 1982 to 2002 in Montgomery, Alabama; around equipment in his workplace, including but not limited to packing, rope, valves, insulation, boilers, pumps, pipes, and paint, which contained significant amounts of asbestos-containing products and materials.

Plaintiff James Alvin Maynard was diagnosed with asbestos-related Pleural Disease on or about November 23, 2009.

12.    Plaintiff **RICHARD PERDUE**, a resident of Birmingham, Alabama, contracted one or more asbestos-related diseases including Asbestosis.  Plaintiff was

continually exposed to asbestos-containing products, produced, manufactured, specified for use, installed, distributed, sold and/or placed into the stream of commerce by defendants as specified herein throughout his employment, and in his environment while employed.

During the course of his employment, Plaintiff Richard Perdue worked, including but not limited to, as a general laborer for Alabama Drywall Supply from approximately 1973 to 1975 in Birmingham, Alabama; as a general laborer for Loveman's Furniture Warehouse from approximately 1975 to 1979 in Birmingham, Alabama; as a general laborer for Sears from approximately 1979 to 1981 in Roebuck, Alabama; and as a general laborer for J.M. Tull from approximately 1979 to 1989 in Birmingham, Alabama; around equipment in his workplace, including but not limited to insulation, joint compound, pipes, furnaces, paint, and compressors, which contained significant amounts of asbestos-containing products and materials.

Plaintiff Richard Perdue was diagnosed with asbestos-related Asbestosis on or about December 16, 2009.

13.     Plaintiff **JIMMIE L. PETERSON**, a resident of Birmingham, Alabama, contracted one or more asbestos-related diseases including Asbestosis.  Plaintiff was continually exposed to asbestos-containing products, produced, manufactured, specified for use, installed, distributed, sold and/or placed into the stream of commerce by defendants as specified herein throughout his employment, and in his environment while employed.

During the course of his employment, Plaintiff Jimmie L. Peterson worked, including but not limited to, as a laborer for Mulga Coal Mine from approximately 1976 to 1982 in Birmingham, Alabama; and as a laborer in the Labor Local 559 from approximately 1984 to 1992 in various locations; around equipment in his workplace,

including but not limited to insulation, joint compound, pipes, paint, gaskets, pumps, and bricks, which contained significant amounts of asbestos-containing products and materials.

Plaintiff Jimmie L. Peterson was diagnosed with asbestos-related Asbestosis on or about December 14, 2009.

14.     Plaintiff **CARRIE JEAN PIERCE**, a resident of Mobile, Alabama, contracted one or more asbestos-related diseases including Asbestosis.  Plaintiff was secondarily exposed to asbestos-containing products, produced, manufactured, specified for use, installed, distributed, sold and/or placed into the stream of commerce by defendants as specified herein throughout her husband's employment, and in her husband's environment while employed.

During Plaintiff's marriage to her former husband, Charles Rasheed, she laundered her husband's clothing that was worn during the course of his employment. During the course of Charles Rasheed's employment he worked, including but not limited to, as a laborer for Ideal Cement (a/k/a Hornell Cement Company) from approximately 1972 to 1993 in Mobile, Alabama; around equipment in his workplace, including but not limited to gaskets, packing, rope, cement, bricks, and joint compound, which contained significant amounts of asbestos-containing products and materials.

Plaintiff Carrie Jean Pierce was diagnosed with asbestos-related Asbestosis on or about December 14, 2009.

15.     Plaintiff **ALICE FAY RICHARDS**, a resident of Morris, Alabama, contracted one or more asbestos-related diseases including Asbestosis.  Plaintiff was continually exposed to asbestos-containing products, produced, manufactured, specified for

use, installed, distributed, sold and/or placed into the stream of commerce by defendants as specified herein throughout her employment, and in her environment while employed.

During the course of her employment, Plaintiff Alice Fay Richards worked, including but not limited to, as a laborer for Wing Industrials from approximately 1976 to 1989 in Greenville, Texas; around equipment in her workplace, including but not limited to gaskets, packing, rope, valves, paint, and insulation, which contained significant amounts of asbestos-containing products and materials.

During Plaintiff's marriage to her former husband, Robert David Richards, she laundered her husband's clothing that was worn during the course of his employment. During the course of Robert David Richards's employment he worked, including but not limited to, as an air craft mechanic for E-Systems Aircraft Co. from approximately 1979 to 1989 in Greenville, Texas; around equipment in his workplace, including but not limited to brakes, clutches, pumps, valves, motors, paint, insulation, and packing, which contained significant amounts of asbestos-containing products and materials.

Plaintiff Alice Fay Richards was diagnosed with asbestos-related Asbestosis on or about December 14, 2009.

16.     Plaintiff **DEDE MOORE**'s Decedent, **DIANA SIMONS,** a resident of Mobile, Alabama, prior to her death contracted one or more asbestos-related diseases including Lung Cancer.   Decedent was secondarily exposed to asbestos-containing products, produced, manufactured, specified for use, installed, distributed, sold and/or placed into the stream of commerce by defendants as specified herein throughout her son's employment, and in her son's environment while employed.

While Plaintiff's son, Dennis Simons, lived with her, she laundered her son's clothing that was worn during the course of his employment. During the course of Dennis Simons's employment he worked, including but not limited to, as a construction worker for Builders Homes Company from approximately 1969 to 1970 in Mobile, Alabama; as a shipfitter helper for Ingalls Shipyard from approximately 1971 to 1972 in Pascagoula, Mississippi; as a student for Southwest State Technical College from approximately 1975 to 1977 in Mobile, Alabama; as a service technician for Bachelors Heating and Air from approximately 1977 to 1978 in Mobile, Alabama; as a service technician for Savoy Heating and Air during approximately 1978 in Mobile, Alabama; and as a welder for Bender's Ship Building and Repair Company from approximately 1982 to 1984 in Mobile, Alabama; around equipment in his workplace, including but not limited to insulation, packing, pipes, pumps, welding rods, cement, joint compound, and gaskets, which contained significant amounts of asbestos-containing products and materials.

Plaintiff's Decedent died of asbestos-related Lung Cancer as the result of exposure to asbestos and asbestos-containing materials and products, on or about, January 31, 2008. This case is brought by Decedent, Diana Simons's daughter and personal representative DeDe Moore.

17.    Plaintiff **JACQUELINE V. STRICKLIN**, a resident of Bessemer, Alabama, contracted one or more asbestos-related diseases including Asbestosis.  Plaintiff was continually exposed to asbestos-containing products, produced, manufactured, specified for use, installed, distributed, sold and/or placed into the stream of commerce by defendants as specified herein throughout her employment, and in her environment while employed.

During the course of her employment, Plaintiff Jacqueline V. Stricklin worked, including but not limited to, as an inspector for Timex Watch Factory from approximately 1971 to 1972 in Little Rock, Arkansas; and as a welder for Jacksonville Electric from approximately 1972 to 1974 in Jacksonville, Arkansas; around equipment in her workplace, including but not limited to insulation, pipe, joint compound, packing, rope, and gaskets, which contained significant amounts of asbestos-containing products and materials.

During Plaintiff's marriage to her former husband, Robert Jones, she laundered her husband's clothing that was worn during the course of his employment. During the course of Robert Jones's employment he worked, including but not limited to, as an overhead crane operator for Inland Steel from approximately 1962-1963 in Gary, Indiana; and as an overhead crane operator for US Pipe (formerly Nashville Bridge) from approximately 1969 to 1970 in Bessemer, Alabama; around equipment in his workplace, including but not limited to insulation, packing, pipes, pumps, and gaskets, which contained significant amounts of asbestos-containing products and materials.

Plaintiff Jacqueline V. Stricklin was diagnosed with asbestos-related Asbestosis on or about December 16, 2009.

18.     Plaintiff **SUSIE TAYLOR**, a resident of Fayette, Alabama, contracted one or more asbestos-related diseases including Pleural Disease.  Plaintiff was continually exposed to asbestos-containing products, produced, manufactured, specified for use, installed, distributed, sold and/or placed into the stream of commerce by defendants as specified herein throughout her employment, and in her environment while employed.

During the course of her employment, Plaintiff Susie Taylor worked, including but not limited to, as a machine operator for Fayette Cotton Mill Inc. from approximately 1955

to 1988 in Fayette, Alabama; around equipment in her workplace, including but not limited to insulation, pipe, joint compound, boilers, thread, frictions, and felt, which contained significant amounts of asbestos-containing products and materials.

Plaintiff Susie Taylor was diagnosed with asbestos-related Pleural Disease on or about December 16, 2009.

19.     Plaintiff **GREGORY WARE**, a resident of Camp Hill, Alabama, contracted one or more asbestos-related diseases including Asbestosis.  Plaintiff was continually exposed to asbestos-containing products, produced, manufactured, specified for use, installed, distributed, sold and/or placed into the stream of commerce by defendants as specified herein throughout his employment, and in his environment while employed.

During the course of his employment, Plaintiff Gregory Ware worked, including but not limited to, as a miller for MTJ Manufacturing from approximately 1974 to 1976 in Jackson Gap, Alabama; as a grinder and forklift operator for Robinson Foundry from approximately 1977 to 1979 in Alexander City, Alabama; as a head mechanic for Firestone from approximately 1979 to 2001 in Dadeville, Alabama; around equipment in his workplace, including but not limited to insulation, cloth, frictions, yarn, joint compound, pipes, brakes, motors, gaskets, and valves, which contained significant amounts of asbestos-containing products and materials.

Plaintiff Gregory Ware was diagnosed with asbestos-related Asbestosis on or about October 22, 2009.

## BACKGROUND FACTS - THE DEFENDANTS

20.     The Plaintiffs adopts, alleges, and incorporates herein by reference all of the averments and allegations set forth in the preceding paragraphs of this complaint as if fully

set forth herein.

21.     The term "Manufacturer Defendant" refers to each and every one of those defendants which produced, manufactured, installed and/or specified for use asbestos-containing products, equipment and/or materials, including their own asbestos-containing products, equipment and/or materials and asbestos-containing products, equipment and/or materials produced or manufactured by others.

22.     The term "Supplier Defendant" refers to each and every one of those defendants which distributed, sold, installed and/or placed into the stream of commerce asbestos-containing products, equipment and/or materials, including their own asbestos-containing products, equipment and/or materials and asbestos-containing products, equipment and/or materials produced or manufactured by others.

23.     The term "Insurer Defendant" refers to each and every one of those defendants which insured Manufacturer and/or Supplier Defendants' companies which distributed, sold, produced, manufactured, installed, specified for use, and/or placed into the stream of commerce asbestos-containing products and/or materials, including their own asbestos-containing products and/or materials and asbestos-containing products and/or materials produced or manufactured by others.

24.     ALLIS-CHALMERS CORPORATION PRODUCT LIABILITY TRUST is a Delaware Corporation that maybe served with process by serving its registered agent at c/o Margaret Barr Bruemmer, Trustee, 3500 Corben Court, Madison, Wisconsin 53704. This defendant is being sued as a manufacturer and supplier defendant.

25.     **AMERICAN OPTICAL CORPORATION** is a Delaware corporation that may be served with process by serving its registered agent at Corporation Trust Company,

Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.   This defendant is being sued as a manufacturer and supplier defendant.

26.     **CERTAINTEED CORPORATION** is a Delaware corporation that may be served with process by serving its registered agent at CT Corporation System, 350 N. St. Paul Street, Dallas, Texas 75201.   This defendant is being sued as a manufacturer and supplier defendant.

27.     **CRANE CO.** is a Delaware corporation that may be served with process by serving its registered agent at Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.  This defendant is being sued as a manufacturer and supplier defendant.

28.     **FEDERAL-MOGUL ASBESTOS PERSONAL INJURY TRUST** as successor to **FELT PRODUCTS MANUFACTURING CO.** and/or the former **VELLUMOID DIVISION** of **FEDERAL-MOGUL CORPORATION** who may be served at their registered agent for service of process Wilmington Trust Company, 1100 N. Market Street, Wilmington, Delaware 19890.  This defendant is being sued as a manufacturer and supplier defendant.

29.     **FORD MOTOR COMPANY** is a Delaware corporation who may be served with process by serving its registered agent at CT Corporation System, 350 N. St. Paul Street, Dallas, Texas 75201.  This defendant is being sued as a manufacturer and supplier defendant.

30.     **J-M MANUFACTURING COMPANY, INC.** is a Delaware corporation that may be served with process by serving its registered agent at The Prentice-Hall Corporation System, Inc., 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808. This defendant is being sued as a manufacturer and supplier defendant.

31.     **GOODRICH   CORPORATION   f/k/a   THE   B.   F.   GOODRICH COMPANY** is a New York corporation that may be served with process by serving its registered agent at Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 701 Brazos Street, Suite 1050, Austin, Texas 78701. This defendant is being sued as a manufacturer and supplier defendant.

32.     **METROPOLITAN   LIFE   INSURANCE   COMPANY** is a New York corporation who may be served with process at its principal place of business at 1 Madison Avenue, New York, New York 10010.  This defendant is being sued as an insurer defendant.

33.     **PFIZER, INC.** is a Delaware corporation that may be served with process by serving its registered agent at Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.  This defendant is being sued as a manufacturer and supplier defendant.

34.     **USX CORPORATION** as successor in interest to UNITED STATES STEEL, LLC, formerly known as **TENNESSEE COAL AND IRON** is a Delaware corporation who may be served with process by serving its registered agent at The Prentice-Hall Corporation System, Inc., 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.  This defendant is being sued as a manufacturer and supplier defendant.

35.     **YARWAY CORPORATION** is a Pennsylvania corporation who may be served with process by serving its registered agent at CT Corporation System, 350 N. St. Paul Street, Dallas, Texas 75201.  This defendant is being sued as a manufacturer and supplier defendant.

36.     Each defendant is sued (a) in its individual capacity, (b) as a successor in interest to each of those entities specifically identified herein as the Defendant's predecessor

in interest, (c) as a successor in interest to each of those entities which, through discovery or otherwise, is identified during the course of litigation as the Defendant's predecessor in interest, (d) as an alter ego to each of those entities specifically identified herein as the Defendant's adjunct or instrumentality, and (e) as an alter ego to each of those entities which, through discovery or otherwise, is identified during the course of litigation as the Defendant's adjunct or instrumentality.

### DEFENDANTS' CONDUCT AND PLAINTIFFS' AND/OR PLAINTIFFS' DECEDENT'S INJURIES

37.     The Plaintiffs adopt, allege, and incorporate herein by reference all of the averments and allegations set forth in the preceding paragraphs of this complaint as if fully set forth herein.

38.     The Defendants acted by and through their agents, servants, and employees, and are liable for the conduct of their agents, servants, and employees.  Whenever this complaint refers to Defendants' actionable conduct, it includes the conduct of Defendants' agents, servants, and employees.

39.     Whenever this complaint refers to asbestos-containing products and/or materials, it includes, without limitation, all products and/or materials containing any amount of any form of asbestos and/or any form of talc.

40.     The Defendants, at all times relevant to this complaint, knew, or in the exercise of ordinary care should have known, that asbestos was poisonous and harmful to human beings and that asbestos-containing products and/or materials posed a serious health hazard to humans, particularly in connection with the human lungs and respiratory system but also in connection with other vital organs.

41.     Plaintiffs and/or Plaintiffs' Decedents were injured and/or died as a direct and proximate consequence of the conduct of the Defendants, which were negligent in some or all of the following respects:

  i.  Producing and/or manufacturing and placing into the stream of commerce asbestos-containing products and/or materials.

  ii.  Distributing, selling, and/or placing into the stream of commerce asbestos-containing products and/or materials, including their own asbestos-containing products and/or materials and asbestos-containing products and/or materials produced or manufactured by others.

  iii.  Installing asbestos-containing products and/or materials at the Worksites, including both their own asbestos-containing products and/or materials produced or manufactured by others.

  iv.  Specifying the use of asbestos-containing products and/or materials on equipment, including both, equipment produced, manufactured, distributed, sold and/or placed into the stream of commerce by the Defendants, and on equipment produced, manufactured, distributed, sold, and/or placed into the stream of commerce by others.

  v.  Marketing asbestos-containing products and/or materials to industries which Defendants knew, or should have known, would expose workers and their families to dust from such asbestos-containing products and/or materials.

  vi.  Failing to properly design and manufacture asbestos-containing products and/or materials.

vii.     Failing to properly test asbestos-containing products and/or materials before they were released for consumer use.

viii.    Failing to develop and to utilize a substitute material for asbestos-containing products and/or materials.

ix.     Failing to specify for use on equipment safe substitutes for asbestos-containing products and/or materials.

x.      Failing to timely and adequately warn Plaintiffs and/or Plaintiffs' Decedents of the dangerous characteristics and serious health hazards associated with secondary exposure to asbestos-containing products and/or materials.

xi.     Failing to provide Plaintiffs and/or Plaintiffs' Decedents with information as to what would be reasonably safe and sufficient wearing apparel and proper protective equipment and appliances, if in truth there were any, to protect the Plaintiffs and/or Plaintiffs' Decedents from being harmed and disabled by secondary exposure to asbestos-containing products and/or materials.

xii.    Failing to take precautions to protect Plaintiffs and/or Plaintiffs' Decedents from exposure to asbestos-containing products and/or materials while Plaintiffs and/or Plaintiffs' Decedents were invitees on premises occupied, controlled, and/or owned by the Defendants.

xiii.   Failing to place timely and adequate health warnings on the containers of asbestos-containing products and/or materials, and/or on the asbestos-containing products and/or materials themselves, and/or on

equipment requiring or calling for the use of asbestos-containing products and/or materials.

xiv.    Failing to take reasonable precautions or to exercise reasonable care to publish, to adopt, and to enforce a safety plan and/or safe method of handling and installing asbestos-containing products and/or materials.

xv.     Failing to recall and/or to remove from the stream of commerce asbestos-containing products and/or materials despite knowledge of their unsafe and dangerous nature.

xvi.    Engaging in a conspiracy or conspiracies to affirmatively misrepresent and/or to suppress material facts about the dangers of exposure to asbestos fibers and the seriousness of the health hazard posed by asbestos fibers.

xvii.   Specifically disregarding the safety of Plaintiffs and/or Plaintiffs' Decedents and fraudulently concealing from Plaintiffs and/or Plaintiffs' Decedents the dangerous nature of the asbestos fibers to which Plaintiffs and/or Plaintiffs' Decedents were exposed.

xviii.  Otherwise (a) causing and/or contributing to cause Plaintiffs and/or Plaintiffs' Decedents to be exposed to asbestos-containing products and/or materials and/or (b) failing to prevent Plaintiffs and/or Plaintiffs' Decedents from being secondarily exposed to asbestos-containing products and/or materials.

42.     The Defendants' actions were negligent, reckless, and willful and wanton and constituted an outrageous disregard for the health and safety of workers and their families,

including Plaintiffs and/or Plaintiffs' Decedents, who were exposed to asbestos-containing products and/or materials in his workplace.

## COUNT ONE

### Negligence and Intentional Tort

43.     The Plaintiffs adopt, allege, and incorporate herein by reference all of the averments and allegations set forth in the preceding paragraphs of this complaint as if fully set forth herein.

44.     The first cause of action for personal injury and wrongful death is grounded in legal theories of negligence and intentional tort.

45.     The Defendants acted tortuously in concert with one another, and in some instances, intentionally, to advance, to pursue or to implement agreements concerning the misrepresentation, concealment, and/or destruction of scientific and legal evidence concerning the health hazards of asbestos.

46.     The Defendants reached an agreement or understanding to inflict a wrong against Plaintiffs and/or Plaintiffs' Decedents and other similarly situated individuals. Moreover, the Defendants' minds met on the object or course of action, amounting to some mutual mental action coupled with intent to commit the acts which resulted in the injuries to Plaintiffs and death to Plaintiffs' Decedents. In short, the Defendants hatched a preconceived plan with unity of design and purpose to misrepresent, conceal and/or destroy scientific and/or legal evidence concerning the health hazards of asbestos. They intended to engage in a course of conduct which resulted in injuries, and the course of conduct was known to them through their officers, directors, agents, servants, and managers.

47.     The Defendants' liability is joint for all of the tortious conduct and resultant

injuries, as well as for the wanton behavior of each Defendant, including the wantonness of co-conspirators not sued herein.

48.     The Defendants acted in concert along with other co-conspirators not sued herein with the intent to deceive and to misinform Plaintiffs Decedents and others about the health hazards of asbestos.

49.     Plaintiffs and/or Plaintiffs' Decedents and others similarly situated were the targets of the intentional acts of deception and misrepresentation.

50.     In particular, the Defendants, acting through their own medical departments and in conjunction with those of their co-conspirators, including their trade associations, investigated the health hazards faced by workers, thereby learning, or in the exercise of reasonable care, having to learn, of the hazards of asbestos.

51.     Acting maliciously, the Defendants initially suppressed and misrepresented the results of investigations, actively concealing the information from customers, from the users of the asbestos-containing products and/or materials, from their own workers, from the employees of contractors working upon their premises, and from governmental and medical authorities. Ultimately, however, the Defendants conspired to destroy or to alter records of knowledge in order to prevent the scientific and medical evidence from being discovered by the victims of their conspiracy and to forestall regulatory efforts and legislation intended to protect innocent workers from the invisible dusty death.

52.     Each Defendant, (a) actively took part in the suppression, concealment, misrepresentation, and eventual destruction of data and evidence, and/or (b) furthered the plan or plans by cooperation, and/or (c) lent aid or encouragement to the actual wrongdoers, and/or (d) ratified and adopted the wrongdoers' acts done for their benefit.

53.     The acts of the Defendants in furtherance of their plan of deception were done intentionally or negligently, and in concert, rendering them each jointly and severally liable for the wanton behavior of the other Defendants and coconspirators not sued herein with whom they acted in concert.

54.     As a result of the conspiratorial acts described above, the dangers of asbestos to the human respiratory and digestive systems were hidden from industry in particular and society in general, with the consequences (a) that asbestos-containing products and/or materials were installed in virtually every plant and building in the United States and a large part of the rest of the industrialized world, (b) that safe substitutes were not developed by industry until after plants and buildings had already been made hazardous by the application or installation of numerous asbestos-containing products and/or materials, and (c) that a large number of people who have come into contact with asbestos-containing products and/or materials have become ill or died as a result of the inhalation or ingestion of asbestos fibers.

55.     Plaintiffs and/or Plaintiffs' Decedents were among those who worked in the hidden danger of asbestos, sometimes unaware of the presence of asbestos and always unaware of the carcinogenic and other adverse properties of asbestos fibers. As a proximate consequence of the conspiratorial acts of the Defendants in affirmatively misrepresenting and/or suppressing evidence concerning the carcinogenic and other adverse properties of the asbestos-containing products and/or materials, some of which were installed in or applied to the Worksites, Plaintiffs and/or Plaintiffs' Decedents were caused to be exposed to, and was unable to protect himself from the asbestos fibers, and consequently, Plaintiffs and/or Plaintiffs' Decedents were exposed to asbestos in their work environment, and thereby suffered grave and progressive bodily injuries and death.

56.     Plaintiffs are entitled to recover damages against each Defendant under a theory of negligence and intentional tort in an amount to be proven at trial.

## COUNT TWO

### Negligence in the Course of Employment

57.     The Plaintiffs adopt, allege, and incorporate herein by reference all of the averments and allegations set forth in the preceding paragraphs of this complaint as if fully set forth herein.

58.     The second cause of action for personal injury and wrongful death is grounded in a legal theory of negligence and intentional tort.

59.     Plaintiffs and/or Plaintiffs' Decedents were exposed to dangerous and carcinogenic asbestos fibers.

60.     The Defendants knew or should have known that Plaintiffs and/or Plaintiffs' Decedents, in the course of their employment, were being exposed to asbestos-containing products and/or materials which would injure Plaintiffs and/or Plaintiffs' Decedents, and the Defendants owed a duty of care to Plaintiffs and/or Plaintiffs' Decedents to protect them from the dangers of exposure to the asbestos-containing products and/or materials.

61.     The Defendants specifically disregarded the safety and health of Plaintiffs and/or Plaintiffs' Decedents and failed to protect them from the carcinogenic and other adverse effects of the asbestos fibers to which he was exposed by (a) failing to warn Plaintiffs and/or Plaintiffs' Decedents that they were being exposed to dangerous asbestos-containing products, and by (b) failing to remove the dangerous asbestos-containing products and/or materials promptly after the Defendants became aware of their presence and the dangers thereof.

62.     The Defendants further concealed from Plaintiffs and/or Plaintiffs' Decedents the carcinogenic and other adverse effects of the asbestos fibers to which they were exposed in their work environment.

63.     As a proximate result of the conduct of the Defendants, Plaintiffs and/or Plaintiffs' Decedents were exposed to dangerous and carcinogenic asbestos fibers which caused them grave bodily injury and death.

64.     Plaintiffs are entitled to recover damages against each Defendant under a theory of negligence in the course of employment in an amount to be proven at trial.

## COUNT THREE

### Strict Liability

65.     The Plaintiffs adopt, allege, and incorporate herein by reference all of the averments and allegations set forth in the preceding paragraphs of this complaint as if fully set forth herein.

66.      The third cause of action for personal injury and wrongful death is grounded in a legal theory of strict liability.

67.     Each Defendant's asbestos containing products possessed latent characteristics or latent functional manufacturing and design defects at the time they were manufactured and at the time the Plaintiffs and/or Plaintiffs' Decedents were exposed to them through their occupations in that the asbestos containing products contained asbestos which each Defendant either knew, or in the exercise of reasonable care should have known, would cause injuries in the form of asbestosis, lung cancer, mesothelioma or other forms of cancer, to those individuals who were required to work with and around products containing asbestos.

68. At the time the Defendants sold or delivered the asbestos containing products to which the Plaintiffs and/or Plaintiffs' Decedents were exposed, and at the time those products were used in the manner and environment intended and without substantial change affecting their condition, the products contained latent characteristics or latent manufacturing and design defects, and were defective and unreasonably dangerous and unfit for their intended use in that:

    i.    They were designed to contain asbestos, a substance deleterious, poisonous and highly harmful to the Plaintiffs and/or Plaintiffs' Decedents, and others similarly situated.

    ii.    They failed to contain a sufficient warning to advise the Plaintiffs and/or Plaintiffs' Decedents that the asbestos and asbestos containing products were poisonous and extremely harmful to their health.

    iii.    They did not contain any protective appliance or equipment to reduce or eliminate the Plaintiffs and/or Plaintiffs' Decedents inhalation of the poisonous and highly harmful asbestos fibers contained in those products.

69. The Defendants were engaged in the distribution and sale of these asbestos products that, without substantial change in the condition in which each Defendant sold them, were the proximate cause of each the Plaintiffs' and/or Plaintiffs' Decedent's injury.

70. Each Defendant and its predecessor in interest knew that its asbestos containing products would be used without inspection for defects, and by placing them on the market represented that they would safely do the job for which they were intended, which must necessarily include the safe handling, installation and replacement of those asbestos

products.

71.     Plaintiffs and/or Plaintiffs' Decedents were unaware of the hazards and defects in the asbestos containing products of the Defendants, which made those products unsafe for the purposes of handling, installation or removal, to the degree that those products would cause the Plaintiffs and/or Plaintiffs' Decedents to develop asbestosis, lung cancer, mesothelioma, or other related physical conditions.

72.     At all times relevant hereto, the asbestos containing products of each of the Defendants were used in the manner intended by the Defendants.

73.     The Defendants' unreasonably dangerous, defective products were the direct and proximate cause of the Plaintiffs and/or Plaintiffs' Decedents illnesses, and, as a result, the Plaintiffs and/or Plaintiffs' Decedents have suffered damages in the form of medical and travel expenses, pain and suffering, extreme emotional distress, and other damages as can be identified at a trial of this action.

74.     Plaintiffs are entitled to recover damages against each Defendant under a theory of strict liability in an amount to be proven at trial.

## COUNT FOUR

### Fraudulent Concealment / Misrepresentation / Alteration of Medical Studies /Conspiracy /Aiding and Abetting Conspiracy

75.     The Plaintiffs adopt, allege, and incorporate herein by reference all of the averments and allegations set forth in the preceding paragraphs of this complaint as if fully set forth herein.

76.     The fourth cause of action for personal injury and wrongful death is grounded in a legal theory of fraudulent concealment / misrepresentation / alteration of medical studies / conspiracy / aiding and abetting conspiracy.

77.     As will be discussed below, the Defendants used a number of trade and industrial hygiene associations to further the goals of their conspiracy to control the dissemination of research and information regarding the hazards of asbestos and other substances to lend an air of independence and legitimacy to the information which was published, albeit in edited form.

78.     Defendant Metropolitan Life and other Defendants named herein, individually and/or as successors-in-interest of other corporations, and as agents of one another and as co-conspirators, aided, abetted, encouraged, counseled, assisted, agreed, and conspired among themselves and with other asbestos manufacturers and distributors to injure Plaintiffs and/or Plaintiffs' Decedents.

79.     Defendants acted in the following fashion:

  i.      Metropolitan Life Insurance Company (Met Life) required a tangible quid pro quo from McGill University in the 1920s in exchange for them providing funding for a study of asbestos disease in Canadian miners.  The study was never published and agents of Met Life materially misrepresented in the published literature the fact that asbestos miners developed asbestosis.

  ii.     In 1932, Met Life, through its agents Dr. Anthony Lanza, Dr. Fellows, and others, assisted the Johns-Manville Corporation with medical examinations of over 1,000 employees of Johns-Manville's factory in Manville, New Jersey.  The report of this study shows that a large percentage of the employees suffered from pneumoconiosis, including asbestosis, including employees not directly involved in the

manufacturing process.  This 1932 medical survey was not published in the medical literature and therefore was unavailable to scientists studying the issue of asbestos disease.  Further collaboration between the conspiring asbestos producers and Met Life officials continued this trend of intentional cover-up.

iii.  Beginning in approximately 1934, Johns-Manville Corporation, through its agents, Vandiver Brown and attorney J. C. Hobart, and conspirator Raybestos-Manhattan, through its agents, Sumner Simpson and J. Rohrbach, suggested to Dr. Lanza, Associate Medical Director of Met Life (insurers of Manville, Raybestos, and others), that Dr. Lanza publish a study on asbestosis in which Dr. Lanza would affirmatively misrepresent a material fact about asbestos exposure; i.e., the seriousness of the disease process, asbestosis.  This was accomplished through intentional deletion of Dr. Lanza's description of asbestosis as fatal and through other selective editing at the behest of the asbestos industry that affirmatively misrepresented asbestosis as a disease process less serious than it actually is and was then known to be, and deletion of information concerning levels of exposure.  As a result, Dr. Lanza's study was published in the medical literature in this misleading fashion in 1935.  The Defendants were motivated, in part, to effectuate this fraudulent misrepresentation and fraudulent nondisclosure by the desire to influence proposed legislation to regulate asbestos exposure and to provide a defense in lawsuits

involving Manville, Raybestos, and others, as well as Met Life, the insurer.

iv.   In 1936, conspirators American Brake Block Corporation, Asbestos Manufacturing Company, Gatke corporation, Johns-Manville corporation, Keasby & Mattison company (then an alter-ego to conspirator Turner & Newall), Raybestos-Manhattan, Russell Manufacturing, Thermoid Rubber co., Southern Asbestos Co., (whose liabilities have been assumed by H. K. Porter Company), Union Asbestos and Rubber company, and United States Gypsum Company, entered into an agreement with the Saranac Laboratories.  Under this agreement, these companies acquired the power to decide what information Saranac Laboratories could publish about asbestos disease and control in what form such publications were to occur.  This agreement gave these conspirators power to affirmatively misrepresent the results of the work at Saranac and also gave these conspirators power to suppress material facts included in any study.  On numerous occasions thereafter, the conspirators exercised their power to prevent Saranac scientists from disclosing material scientific data resulting in numerous misstatements of fact being made about scientific data resulting in numerous misstatements of fact being made at scientific meetings.

v.   On November 11, 1948, representatives of the following conspirators met at the headquarters of Johns-Manville Corporation:  American

Brake Block Division of American Brake and Shoe Foundry, Gatke Corporation, Keasby & Mattison Company (whose assets and liabilities were later purchased by H. K. Porter Company), Union Asbestos and Rubber Company, and U. S. Gypsum Company. U. S. Gypsum did not send a representative to the meeting, but instead authorized Vandiver Brown of Johns-Manville to represent its interest at the meeting and to take action on its behalf.

vi.     At the November 11, 1948, meeting, these Defendants and their representatives decided to exert their influence to materially alter and misrepresent material facts about the substance of research started by Dr. Leroy Gardner at the Saranac Laboratories beginning in 1936. Dr. Gardner's research involved the carcinogenicity of asbestos in mice and also included an evaluation of the health effects of asbestos on humans with a critical review of the then-existing standards of dust exposure from asbestos and asbestos-containing products.

vii.    At this meeting, the Defendants intentionally and affirmatively determined that Dr. Gardner's work should be edited to specifically delete material facts about the cancer-causing propensity of asbestos and the health effects of asbestos on humans and critique of the dust standards and then published it in the medical literature as edited by Dr. Arthur Vorwald. The acts of these Defendants were carried out by co-conspirator Defendant Met Life's agent, Dr. Lanza. These Defendants thereby fraudulently misrepresented the risks of asbestos

exposure to the public in general and the class of persons exposed to asbestos, including Plaintiffs and/or Plaintiffs' Decedents.

viii.   As a direct result of influence exerted by the above-described conspirators, Dr. Vorwald published Dr. Gardner's edited work in January 1951, in the Archives of Industrial Hygiene and Occupational Medicine (Vol. 3, No. 1), a journal of the American Medical Association.  The published version stressed those portions of Gardner's work that the conspirators wished stressed, but omitted references to cancer, to human asbestosis, and to the inadequacy of the then-established threshold limit values (TLV's).  Furthermore, that article made a false claim that the published report was the complete survey of Dr. Gardner's work.  The Defendants thereby fraudulently, affirmatively, and deliberately disseminated this misleading Dr. Vorwald publication to university libraries, government officials, medical doctors, agencies, the public, and others.

ix.   Such action constituted a material affirmative misrepresentation of the total context of material facts involved in Dr. Gardner's work and resulted in creating an appearance that the inhalation of asbestos was less of a health problem than Dr. Gardner's unedited work indicated.

x.   The following conspirators and others were members of the trade association known as Quebec Asbestos Mining Association:  Johns-Manville Corporation, Carey-Canada (individually and as successor to Quebec Asbestos Corporation), Rapid American Corporation

(successor to Philip Carey and Quebec Asbestos Corporation, National Gypsum Company (n/k/a Asbestos Claims Management Corporation), Flintkote, Cape Asbestos, Turner & Newall (individually and successor to Bell Asbestos). The members of Q.A.M.A. participated in the above-described misrepresentation of the work of Dr. Gardner published by Dr. Vorwald in the AMA Archives of Industrial Health in 1951. Evidence of the Q.A.M.A., as well as correspondence from Co-conspirators, indicates close monitoring of the editing process by Q.A.M.A.'s representative, Ivan Sabourin, acting on behalf of all Q.A.M.A's members.

xi.   Defendants who were members of the Q.A.M.A. began, on or about 1950, to formulate a plan to influence public opinion about the relationship between asbestos and cancer by influencing the medical literature on this subject and then touting and disseminating this literature to the public and to organizations and legislative bodies responsible for regulatory controls of asbestos with the specific intent of misrepresenting the existing scientific information and suppressing contrary scientific data in their possession and control.

xii.  This plan of misrepresentation and influence over the medical literature began on or about 1950 when the Q.A.M.A. members selected Saranac Laboratories to do an evaluation of whether cancer was related to asbestos. After a preliminary report authored by Dr. Vorwald in 1952 indicated that a cancer/asbestos relationship might

exist in experimental animals, the Q.A.M.A. members refused to further fund the study and it was terminated and never publicly discussed.

xiii.    As a result of the termination of this study, these Defendants fraudulently withheld information from the public and affirmatively misrepresented to the public and responsible legislative and regulatory bodies that asbestos did not cause cancer, including affirmative misrepresentations by conspirators' agents Kenneth W. smith, M.D., Paul Cartier, M.D., Arthur J. Vorwald, M.D., Anthony J. Lanza, M.D., Vandiver Brown, and Ivan Sabourin, said misrepresentations being directed to inter alia, U. S. Government officials, Canadian Government officials, U. S. National Cancer Institute, other medical organizations, and the general public, including Plaintiffs and/or Plaintiffs' Decedents.

xiv.    Subsequently, the Q.A.M.A. Defendant conspirators contracted with the Industrial Hygiene Foundation (I.H.F.) and Dr. Daniel Braun to further study the relationship between asbestos exposure, asbestosis and lung cancer. In 1957, Drs. Braun and Truan reported to the Q.A.M.A. that asbestosis did increase a worker's chances of incurring lung cancer.

xv.    The Q.A.M.A. Defendants thereafter caused, in 1958, a publication of the work by Braun and Truan in which the findings regarding increased incidence of cancer in persons with asbestosis was edited out

by agents of the Q.A.M.A. The published version of this study contained a conclusion that asbestos exposure did not increase the incidence of lung cancer, a conclusion known by the Defendant conspirators to be patently false.

xvi.     By falsifying and causing publication of studies concluding that the asbestos exposure did not cause lung cancer and simultaneously omitting a documented Finding that asbestosis did increase the risk of lung cancer, the Q.A.M.A. Defendants affirmatively misrepresented to the public and concealed from the public the extent of risk associated with inhalation of asbestos fibers.

xvii.    In approximately 1958, the Q.A.M.A. Defendants publicized the edited works of Drs. Braun and Truan at a symposium in an effort to fraudulently misrepresent to the public and persons exposed to asbestos that the inhalation of asbestos dust would not cause cancer.

xviii.   The fraudulent misrepresentation beginning in 1946, as elaborated above and continuing with publication of the 1958 Braun/Truan study, influenced the standard set for the TLVs and inhibited the lowering of the threshold limit value due to the cancer risk associated with asbestos inhalation.

xix.     In 1967, the Q.A.M.A. Defendants determined at their trade association meeting that they would intentionally mislead consumers about the extent of risk involved in inhalation of asbestos products.

xx.      In 1952, a symposium regarding the health effects of asbestos was held

at the Saranac Laboratories. The following conspirators were in attendance: Central Mining & Investment Corporation, Johns-Manville, Turner & Newall, Raybestos-Manhattan, and Q.A.M.A. members by way of their agents, Cartier, Sabourin, and LeChance.

xxi.   At this meeting, the occurrence of lung cancer and asbestosis in product users was discussed and the carcinogenic properties of all fiber types of asbestos were also discussed. In an affirmative attempt to mislead the public about the extent of health risk associated with asbestos, and in an effort to fraudulently conceal those risks from the public, these Defendants conspired to prevent publication of the record of his 1952 Saranac Symposium and it was not published. In addition, the conspirators induced Dr. Vorwald not to announce the results of his and Dr. Gardner's animal studies showing excess cancers in animals and thereby fraudulently misrepresenting existing data, albeit secret, that could not be publicized because of the secret provisions contained in the 1936 Saranac agreement required by the asbestos industry members.

xxii.   The following conspirators were members of the Magnesia Insulation Manufactures Association MIMA): Philip-Carey Corporation (predecessors to Rapid American Corporation), Johns-Manville, and others.

xxiii.   In 1955, these conspirators caused to be published the MIMA 85% Magnesia insulation Manual. This manual falsely and fraudulently

PLAINTIFFS' ORIGINAL COMPLAINT AND JURY DEMAND                Page 40 of 52

misrepresented that asbestos-containing products offered no hazard to workers who used these products.

xxiv.    The following conspirators were members of the trade organization known as the Asbestos Textile Institute (ATI): Garlock, Uniroyal, Raybestos-Manhattan, Johns-Manville, H. K. Porter, Keasby & Mattison (individually and through its alter-ego Turner & Newell), National Gypsum (n/k/a Asbestos claims Management Corporation), Cape Asbestos and others.

xxv.    In 1947, the members of the ATI, received a report from W.C.L. Hemeon regarding asbestosis that suggested re-evaluation of the then-existing TLVs for asbestos exposure.  These Defendants and Metropolitan Life caused this report not to be published and thereby fraudulently concealed material facts about asbestos exposure from the public and affirmatively misrepresented to the public and classes of persons exposed to asbestos that the then-existing TLV was acceptable.  Thereafter, these Defendant conspirators withheld additional material information on the dust standards from The American Conference of Governmental Industrial Hygienists (ACGIH), thereby further influencing evaluation of TLVs for asbestos exposure.

xxvi.    In 1953, conspirator National Gypsum (n/k/a Asbestos Claims Management Corporation), through its agents, in response to an inquiry from the Indiana Division of Industrial Hygiene regarding

health hazards of asbestos spray products, refused to mail a proposed response to that division indicating that respirators should be worn by applicators of the products.  National Gypsum's response distorted and fraudulently misrepresented the need for applicators of asbestos spray products to wear respirators and fraudulently concealed form such applicators the need for respirators.

xxvii.  In 1955, conspirator Johns-Manville, through its agent Kenneth W. Smith, M.D., caused to be published in the AMA Archives of Industrial Health, an article entitled A Pulmonary Disability in Asbestos Workers.  This published study materially altered the results of an earlier study in 1949 concerning the same set of workers.  This alteration of Dr. Smith's study constituted a fraudulent and material misrepresentation about the extent of the risk associated with asbestos inhalation.

xxviii.  In 1955, the National Cancer Institute held a meeting at which conspirators Johns-Manville (individually and as an agent for other alleged co-conspirators) and Dr. Vorwald (as agent of co-conspirators) affirmatively misrepresented that there were no existing animal studies concerning the relationship between asbestos exposure and cancer when, in fact, the conspirators were in secret possession of several studies which demonstrated that positive evidence did exist.

xxix.  In 1957, the members of the ATI, jointly rejected a proposed research study on cancer and asbestos and this resulted in fraudulent

concealment from the public of material facts regarding asbestos exposure and also constituted an affirmative misrepresentation of the then-existing knowledge about asbestos exposure and lung cancer.

xxx.    In 1964, the members of the ATI met to formulate a plan for rebutting the association between lung cancer and asbestos exposure that had been recently discussed by Dr. Irvin J. Selikoff.  Thereafter, these members of the ATI embarked upon a campaign to further misrepresent the association between asbestos exposure and lung cancer.

xxxi.   In 1970, through their agents, defendants The Celotex Corporation (predecessor of Rapid American Corporation) and Cary-Canada, affirmatively misrepresented that it had been in the asbestos business since 1918 and found no reported conditions of asbestosis or lung disease.  This constituted a fraudulent misrepresentation about the material facts known to these Defendants.

xxxii.  All Conspirators approved and ratified and furthered the previous conspiratorial acts of conspirators Johns-Manville, Raybestos Manhattan, and Anthony J. Lanza, M.D., acting on behalf of Met Life, and all alleged co-conspirators during the relevant time period and circumstances alleged above, acted as agents and co-conspirators for the other conspirators.

xxxiii. Certain of the Defendants and/or co-conspirators, including but not limited to Westinghouse Electric Corporation, Metropolitan Life,

Raybestos Manhattan, Johns-Manville, Dresser Industries, Harbison-Walker, General Refractories, Pittsburgh Corning, PPG Industries, General Electric, Uniroyal, Owens-Illinois and Owens-Corning Fiberglas, were members of the Industrial Hygiene Foundation (AIHF). The IHF, touted by its industry members as an independent research agency, was used by the members of the asbestos industry to suppress the truth about asbestos and other substances and generate misleading or outright substances and generate misleading or outright false scientific publications. For example, in the 1940s the IHF was contacted by the Asbestos Textile Institute to conduct a study on asbestos dust. Mr. W. C. L. Hemeon, an industrial hygienist who worked for the IHF, completed the study and forwarded the report entitled Report on Preliminary dust Investigation for Asbestos Textile Institute in June 1947. Mr. Hemeon's report indicated that workers exposed to less than the recommended threshold limit value for asbestos were nonetheless developing diseases. The IHF never published this study and, in doing so, acted to conceal the study from the general public, including asbestos-exposed workers.

xxxiv.  As discussed infra, the IHF also assisted in the QAMA in the publication of the edited version of the Braum Truan report in 1958 which reported the conclusion, known to the IHF and its members to be false, that asbestos exposure did not increase the incidence of lung cancer.

xxxv.     The Activities of IHF and its members substantially assisted the co-conspirators by retarding the development of knowledge about the hazards of asbestos.

xxxvi.    Metropolitan Life and other co-conspirators downplayed the seriousness of the hazard of exposure to diatomaceous earth by misleading public health officials in California.

80.     As a direct and proximate result of the above referenced conspirators intentional publication of deceptive and misleading medical data and information as described in the preceding paragraphs, and upon which data the Plaintiffs and/or Plaintiffs' Decedents, and those charged with warning them reasonably relied, the Plaintiffs and/or Plaintiffs' Decedents inhaled or otherwise were exposed to and ingested hazardous dust resulting in the injuries described in this Complaint.

81.     Additionally and alternatively, as a direct and proximate result of Metropolitan Life's actions and omissions as described above, the Plaintiffs and/or Plaintiffs' Decedents were caused to remain ignorant concerning the danger of human exposure to asbestos and other substances, resulting in damage to the Plaintiffs and/or Plaintiffs' Decedents by depriving the Plaintiffs and/or Plaintiffs' Decedents, their employers, and the general public of opportunities to be aware of the hazards of asbestos and other substances exposure, and thus the opportunity to take proper safety precautions and/or avoid this exposure.  Because of this ignorance and intentional failure to warn, the Plaintiffs and/or Plaintiffs' Decedents inhaled, were exposed to, or otherwise ingested hazardous asbestos dust resulting in the injuries described above.

82.     The conspirators fraudulently concealed from the Plaintiffs and/or Plaintiffs'

Decedents the alteration of its published test results, the actions and omissions and concerted design and conspiracy, all as described in the paragraphs above, until the Plaintiffs and/or Plaintiffs' Decedents discovered said conduct following these diagnoses of asbestos-related injuries.

83.     Certain of the Defendants, in addition, belong to the IHF and the AIA/NA also known as the Asbestos Information Association/North America and took part in certain activities wherein they individually and through their organization took steps to stop the dissemination of information with regard to asbestos and its hazards, took steps to influence proposed regulation of asbestos by making misleading statements regarding the health effects of asbestos and conspired to make false representations with regard to the safety and hazards of asbestos-containing products.

84.     Certain of these Defendants in the IHF, AID/NA, ATI, the Asbestosis Research Council and/or other organizations, acting individually and as members of a conspiracy and as agents of other co-conspirators took steps to fraudulently conceal and/or fraudulently misrepresent the hazards of asbestos which proximately caused injury and death to the Plaintiffs and/or Plaintiffs' Decedents in the following manner:

xxxvii.     Published material or caused to be published material that the Defendants individually and/or through their organizations knew was false and incomplete in that the Defendants knowingly and deliberately deleted certain references to the known health hazards of asbestos and asbestos related products;

xxxviii.    That the publication of these false and misleading reports and non-disclosure of documented reports on the health hazards of asbestos

were done to maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos related products;

xxxix.   That the acts were perpetrated to influence in the Defendants' favor proposed legislation to regulate asbestos exposure, and

xl.   That the acts in question were also done to provide a defense in lawsuits brought for injury and death resulting from asbestos disease.

85.   In continuing their asbestos exposure, the Plaintiffs and/or Plaintiffs' Decedents reasonably relied upon the published medical and scientific data about the purported lack of hazards of asbestos products, Defendants' false representations that their products were safe, and the lack of publicity about the hazards of asbestos, which he reasonably believed to be safe.

86.   Defendants individually, as members of a conspiracy, and as agents of other co-conspirators intended that the Plaintiffs and/or Plaintiffs' Decedents rely upon the published reports regarding the safety of asbestos and asbestos-related products, to continue their exposure to those products.

87.   Defendants individually, as members of a conspiracy, and as agents of other co-conspirators are in a position of superior knowledge regarding the health hazards of asbestos and, therefore, the Plaintiffs and/or Plaintiffs' Decedents had a right to rely on the published reports commissioned by the Defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos related products.  This conduct was directed at all state of the United State including Alabama.

88.   Certain Defendants belonged to The Mellon Institute and the Industrial

Hygiene Foundation (IHF), which were institutes whose functions included involved in research and communications to member companies regarding the health effects of inhaling asbestos dust.  In 1935, The Mellon Institute conducted a meeting at which time a plan was developed where members of the asbestos industry would join together to combat publicity and dissemination of data on the hazards of asbestos.

89.     Beginning in the early 1940's, the IHF was involved in a study by W.C.L. Hemeon entitled Report of Preliminary Dust Investigation for Asbestos Textile Institute, June 1947.  This study was done in connection with members of the Asbestos Textile Institute (ATI).  This study found that workers exposed to less than the recommended threshold limit value for asbestos were nonetheless developing disease.  The IHF never published this study and, in doing so, acted to conceal the study from the general public including asbestos-exposed workers.

90.     Beginning in the mid-1950's, the IHF and The Mellon Institute were involved in the publication of works by Dr. Braun and Mr. Truan entitled 'An epidemiological Study of Lung Cancer in Asbestos Miners.' In its original form in September, 1957, this study had concluded that workers with asbestosis had an increased incidence of lung cancer and that the Canadian government had been under-reporting cases of asbestosis.  The final published version of this study in June, 1958, deleted the conclusion that workers with asbestosis suffered an increased incidence of lung cancer and that the Canadian government had been under-reporting cases of asbestosis.  The members and agents of the IHF and The Mellon Institute, individually and through these organizations, conspired with the members of the Quebec Asbestos Mining Association (Q.A.M.A.) and their legal counsel, Ivan Sabourin, to delete the above-described information regarding asbestos and cancer.

91.     The above-described actions of the members and agents of the IHF and The Mellon Institute constituted intentional deception and fraud in actively misleading the public about the extent of the hazards connected with breathing asbestos dust.

92.     The above-described actions of the IHF and The Mellon Institute and their individual members substantially contributed to retarding the development of knowledge about the hazards of asbestos and thereby substantially contributed to injuries suffered by the Plaintiffs and/or Plaintiffs' Decedents.  The Plaintiffs and/or Plaintiffs' Decedents reserve the right to supplement these allegations once the defendants have identified all their memberships in trade organizations and the memberships of their officers, agents, employees and directors.

93.     Plaintiffs are entitled to recover damages against each Defendant under a theory of fraudulent concealment / misrepresentation / alteration of medical studies / conspiracy / aiding and abetting conspiracy in an amount to be proven at trial.

## COUNT FIVE

### Product Liability, Combined and Concurring Negligence, Intentional Tort and Conspiracy

94.     The Plaintiffs adopt, allege, and incorporate herein by reference all of the averments and allegations set forth in the preceding paragraphs of this complaint as if fully set forth herein.

95.     The fifth cause of action for personal injury and wrongful death is based on legal theories of product liability, combined and concurring negligence, intentional tort, and conspiracy.

96.     As a result of Defendants' actions, Plaintiffs and/or Plaintiffs' Decedents were exposed to unreasonably dangerous, defective, negligently manufactured and marketed

asbestos-containing products and/or materials, which caused grave and progressive bodily injury to Plaintiffs and which proximately caused the death of Plaintiffs' Decedents.

97.     Plaintiffs assert that they have filed suit either within the applicable state statute of limitations period, and/or that their claims are timely as a matter of law pursuant to 42 U.S.C. § 9658, a provision of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). Under this provision, the running of the state statute of limitations for applicable actions is delayed until "the date the plaintiff knew (or reasonably should have known) that the personal injury or property damages ... were caused or contributed to by the hazardous substance or pollutant or contaminant concerned." 42 U.S.C. § 9658(b)(4)(A). The provision " 'creates a federally mandated discovery rule for the accrual of state law claims involving releases of hazardous substances that cause or contribute to personal injury.... ' " *Kowalski v. Goodyear Tire and Rubber Co.*, 841 F. Supp. 104, 107 (W.D.N.Y. 1994)(quoting *Soo Line Ry. Co. v. B.J. Carney & Co.*, 797 1472, 1487 (D.Minn. 1992). Application of the statute to a state law cause of action does not depend on the existence of an underlying federal CERCLA action.  *Id*. at 107-08.

98.     Plaintiffs are entitled to recover damages against each Defendant under a theory of product liability, combined and concurring negligence, intentional tort and conspiracy in an amount to be proven at trial.

## **COUNT SIX**

### **Wrongful Death**

99.     The Plaintiffs adopt, allege, and incorporate herein by reference all of the averments and allegations set forth in the preceding paragraphs of this complaint as if fully set forth herein.

100.     The sixth cause of action is based on the legal theories of wrongful death.

101.     As surviving spouses and/or heirs, the Plaintiffs bring this action to recover for the wrongful death, and the full value of the life their respective decedents, William James Johnson and Diana Simons. As set forth above in the preceding paragraphs of this complaint, Defendants' wrongful acts were the direct and proximate cause of the Plaintiffs' Decedents deaths.

102.     Plaintiffs are entitled to recover damages against each Defendant under a theory of wrongful death in an amount to be proven at trial.

## COUNT SEVEN

### Exemplary Damages

103.     The Plaintiffs adopts, alleges, and incorporates herein by reference all of the averments and allegations set forth in the preceding paragraphs of this complaint as if fully set forth herein.

104.     The seventh cause of action is based on the legal theories of exemplary damages.

105.     The actions and inactions of all Defendants was of such character as to make the Defendants subject to exemplary damages.

106.            The conduct of all Defendants, as set forth herein above, was malicious, willful, reckless, wanton, fraudulent and/or in bad faith and otherwise indifferent to the rights, welfare, and safety of Plaintiffs and/or Plaintiffs' Decedents.

107.     As a result of the conduct of all Defendants, Plaintiffs herein seek exemplary damages in such an amount as to be found to be proper under the facts and circumstances.

### PRAYER

WHEREFORE, PREMISES CONSIDERED, the Plaintiffs demand judgment against the Defendants, and each of them, jointly and severally, for general damages, for punitive and exemplary damages, for their costs expended herein, for prejudgment interest from the date of Plaintiffs' and/or Plaintiffs' Decedent's exposure to asbestos-containing products, and post judgment interest on the judgment at the rate allowed by law, and for such other and further relief, both at law and in equity to which Plaintiffs may show themselves justly entitled.

## JURY DEMAND

Plaintiffs demand that all issues of fact in this case be tried to a properly impaneled jury.

This 27th day of January, 2010.

Respectfully submitted,

R.G. TAYLOR II, PC & ASSOCIATES

/s/James Ferrell_____
JAMES FERRELL (TX BAR #00785857)
BRADLYN COLE (TX BAR #24064141)
One Allen Center
3400 Penthouse
500 Dallas Street
Houston, TX 77002
Telephone:  (713) 654-7793
Facsimile:   (713) 654-7814
Attorneys for Plaintiffs